```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF SOUTH DAKOTA

 3                   WESTERN DIVISION


 4  *    *    *    *    *    *    *    *    *    *

 5  UNITED STATES OF AMERICA,          CR 14-50033

 6                    PLAINTIFF,    OCTOBER 31, 2014
            VS.                     RAPID CITY, SOUTH DAKOTA
 7
    KENNEDY RUNNER,

 8                    DEFENDANT.

 9  *    *    *    *    *    *    *    *    *    *

10
                  REDACTED TRANSCRIPT OF COURT TRIAL
11
            BEFORE THE HONORABLE JEFFREY L. VIKEN,
12            CHIEF UNITED STATES DISTRICT JUDGE


13

14  APPEARANCES:

15  FOR THE PLAINTIFF:  ERIC KELDERMAN, ESQ.
                        Assistant United States Attorney
16                      District of South Dakota
                        Andrew W. Bogue Federal Building
17                      515 Ninth Street
                        Rapid City, South Dakota 57701
18
    FOR THE DEFENDANT:  STEPHEN D. DEMIK, ESQ.
19                      Assistant Federal Public Defender
                        District of South Dakota
20                      703 Main Street, Second Floor
                        Rapid City,South Dakota 57701
21
    COURT REPORTER:     JUDITH M. THOMPSON, R.P.R.
22                      Official Court Reporter
                        909 St. Joseph Street
23                      Suite 505
                        Rapid City, South Dakota 57701
24

25

                        JUDITH M. THOMPSON
            (605) 348-8610     FAX  (605) 343-6842
```

 1              THE COURT:  This is the time set for a court

 2    trial in the case of United States versus Kennedy Runner,

 3    our file 14-50033.

 4              May I have the appearance of government counsel,

 5    please?

 6              MR. KELDERMAN:  Eric Kelderman on behalf of the

 7    United States.  With me is Special Agent Christian Corwin

 8    with the FBI.

 9              THE COURT:  Afternoon, gentlemen.

10              MR. KELDERMAN:  Good afternoon.

11              THE COURT:  Defense.

12              MR. DEMIK:  Stephen Demik, Assistant Federal

13    Public Defender.  I represent Kennedy Runner, who is

14    present in court.

15              THE COURT:  Good afternoon, Mr. Runner.

16              THE DEFENDANT:  Good afternoon, Judge, Your

17    Honor, sir.

18              THE COURT:  Well, if I understand the procedural

19    history correctly, there's been a stipulation or agreement

20    by the attorneys for Mr. Runner to conduct a court trial on

21    the charge.  The charge in this case is set out in the

22    indictment which reads:  On or about March 28, 2014, in

23    Pennington County, in the District of South Dakota, the

24    defendant, Kennedy Runner, on an aircraft in the special

25    aircraft jurisdiction of the United States, namely, United

1  Airlines flight 6089, did knowingly interfere with and

2  attempt to interfere with the performance of the duties of

3  a flight crew member and flight attendant on the aircraft

4  and lessened the ability of the member and attendant to

5  perform those duties by intimidating the flight attendant

6  and flight crew member specifically by threatening to kill

7  the passengers on the aircraft, in violation of 49 United

8  States Code Section 46504.

9          The burden of proof is on the United States for

10  proof beyond a reasonable doubt.  Are you ready to proceed,

11  Mr. Kelderman?

12          MR. KELDERMAN:  I am, Your Honor.

13          THE COURT:  Please proceed.

14          MR. KELDERMAN:  I call Officer Dale Hatzenbuhler.

15          THE COURT:  And Mr. Demik, feel free to inquire

16  from where you are, if you wish.  And, Mr. Runner, you can

17  most certainly, sir, if you choose to testify, may testify

18  from where you are seated.

19        DALE HATZENBUHLER, GOVERNMENT'S WITNESS, SWORN

20                    **DIRECT EXAMINATION**

21  BY MR. KELDERMAN:

22  Q.   Good afternoon.

23  A.   Good afternoon.

24  Q.   Will you state your name and spell your last name,

25  please?

                    JUDITH M. THOMPSON
            (605) 348-8610    FAX  (605) 343-6842

1    A.   It's Dale Hatzenbuhler, H-a-t-z-e-n-b-u-h-l-e-r.

2    Q.   Where do you work, sir?

3    A.   With the Rapid City Police Department.

4    Q.   How long have you been with the Rapid City Police

5    Department?

6    A.   Right about 25 years.

7    Q.   What is your current job duty station?

8    A.   I work out at the Rapid City Regional Airport.

9    Q.   Were you so employed and working out at the Rapid City

10   Regional Airport on March 28, 2014?

11   A.   Yes, I was.

12   Q.   On that date, did you have contact with a person who

13   you later learned to be known as Kennedy Runner?

14   A.   Yes, I did.

15   Q.   Can you describe how that interaction began?

16   A.   I was up in our work station at the security check

17   point and at one point a TSA officer came up and told me

18   that there was a gentleman up at the beginning of the check

19   point that appeared to be upset.  So I walked out, looked

20   up that way, saw the person later identified as Mr. Runner.

21   His arms were flailing and he was upset; he was talking

22   with the supervisor at TSA.  So I watched for a little bit.

23   She never motioned for me, so I figured everything was

24   okay, so I went back and sat down.

25            And then later at the end of the check point, I

1    started hearing some yelling and stuff, so I stepped

2    outside.  At that point, I noted Mr. Runner was arguing and

3    yelling.  I couldn't understand what he was yelling about,

4    so I walked over and see if he would calm down, which he

5    didn't.  So finally, I told him he needed to be quiet.  I

6    sat him down and told him numerous time he needed to be

7    quiet.  I finally finished with the security of his bags,

8    checking everything, and I talked to him and told him that

9    if he continued to be loud, he probably wasn't going to get

10   to fly because the pilot had the option of not letting

11   anybody fly.

12   Q.   Did Mr. Runner at that point calm down or quiet down?

13   A.   Yes, he did.  He had calmed down, so we talked a

14   little bit.  Again, I walked him up.  They had actually

15   been paging his name for the flight and I knew he was at

16   gate 2, so we were walking down and I was talking with him.

17   He walked past gate 2 and I asked him which gate he had.

18   He said it was 2, so we walked back over that way.  He was

19   one of the last ones on.  And I again warned him.  I said,

20   "Mr. Runner, you need to be quiet, calm down in there, or

21   they are not going to let you fly," and he told me he was

22   okay.

23   Q.   Was he relatively calm, then, at that point and you

24   were comfortable letting him get on the plane?

25   A.   Yes, he was calm and he was cooperative; did

1    everything I asked.  So I made the decision I let him go

2    on.

3    Q.   All right.  Did you see where Mr. Runner went?

4    A.   Well, I watched him go through the gate, the doorway,

5    then go down the jet port.  I didn't actually see him get

6    on the plane.

7    Q.   This person that was later identified as Kennedy

8    Runner, do you see him in the courtroom here today?

9    A.   Yes, I do.

10   Q.   Would you point to him and identify him by something

11   he is wearing?

12   A.   Over there with gray hair, mustache, a little bit of a

13   beard, and gray striped shirt.

14          MR. KELDERMAN:  Your Honor, may the record

15   reflect identification of the defendant?

16          THE COURT:  Yes.

17   Q.   (BY MR. KELDERMAN)   After that, when Mr. Runner went

18   down that jetway, did you have further contact with him on

19   March 28, 2014?

20   A.   Not right away; it was a little bit later.

21   Q.   What time of day -- I didn't ask -- what time of day

22   was all this what you were just describing a little while

23   ago?

24   A.   It was about 6:10 when I was notified about the plane.

25   Q.   I'm sorry.  The initial contact that you had with

1    Mr. Runner.

2    A.    Probably, like, 0530.

3    Q.    So then you said there was something where you had

4    contact later.  When was that?

5    A.    At about 6:10 I was -- I received a call from the

6    airlines that the flight was coming back in to the gate.

7    The pilot said he had an unruly passenger and asked for law

8    enforcement assistant.  So at that point I contacted the

9    fire department there, actually my backup, and had them

10   come over and briefed them what was going on.  At that

11   point I suspected it was probably Mr. Runner.  And when the

12   plane pulled in, I went down the jet port with the

13   firefighters, went on, and they told me that the passenger

14   was in seat 4A and it was indeed Mr. Runner.

15   Q.    Did the door open for you before you went in there?

16   A.    Yes.  They had the door open for me.

17   Q.    Do you know if that plane had left that jetway?

18   A.    Yes.  It had pulled away; they were actually going to

19   de-ice when all this started happening.

20          THE DEFENDANT:  We have just heard practically

21   all lies.  I never seen him or talked to him and he never

22   saw or talked to me.

23          MR. KELDERMAN:  May I proceed, Your Honor?

24          THE COURT:  Yes.  Mr. Runner, you will have an

25   opportunity to testify, of course.

1          THE DEFENDANT:  Yes sir.

2          THE COURT:  Go ahead, Mr. Kelderman.

3          MR. KELDERMAN:  Thank you, Your Honor.

4     Q.   Did you have contact with Mr. Runner again after the

5     airplane doors opened?

6     A.   Yes.  I went up -- went and stood by him, helped him

7     up, escorted him to -- the plane is very narrow, so the

8     firefighters couldn't come all the way on, so I escorted

9     him back, handed him off to one of the firefighters, then

10    grabbed his belongings and handed them off to the

11    firefighters and had them go out on the jet port.

12          And then at that point I handed my handcuffs to

13    them and told them to handcuff him until I figured out what

14    I had.  And then I started to talk with the flight

15    attendant and she told me that he was causing a

16    disturbance.  She told him to calm down and he appeared to,

17    so she went about her duties.  And then later when she came

18    back she said the passengers were telling her that he was

19    threatening to kill them, so she notified the pilot, and

20    that's when the pilot made the decision to come back, I

21    guess.

22          So then I went and talked to a couple -- few of

23    the passengers and they all told me that he'd been

24    threatening to kill them.  I went and talked to the pilot,

25    was getting information from him, when I could hear Mr.

1    Runner yelling, so I got as much information as I could

2    from the pilot, then went out and at that point we decided

3    we'd escort Mr.  Runner out of the view of everybody and

4    public, and everything.  So we took him up to our

5    administration offices; I was escorting him.  He'd been

6    threatening to kill the firefighters and at that point he

7    started threatening me that he was going to kill me.

8    Q.   Was he arrested?

9    A.   Yes.  He was arrested for disorderly conduct and

10   threatening law enforcement.

11   Q.   Did they take him to the Pennington County Jail?

12   A.   Yes.

13   Q.   Were you the one that transported him?

14   A.   No, I wasn't.

15   Q.   Did you hand him off to another person?

16   A.   Yes.  Two other officers arrived; one transported him;

17   the other one helped me do the report.

18           MR. KELDERMAN:  Your Honor, I don't have anything

19   else at this time.

20           THE COURT:  All right.  Mr. Demik, do you wish to

21   inquire?

22           MR. DEMIK:  Briefly, Your Honor.

23                    **CROSS-EXAMINATION**

24   BY MR. DEMIK:

25   Q.   Officer, now you'd agree with me that Mr. Runner at

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    times is difficult to understand, wouldn't you?

2    A.    Yes.

3    Q.    And I think you told us about how in the initial time

4    that you contacted him you were able to have a conversation

5    with him?

6    A.    Yes.

7    Q.    To calm him down?

8    A.    Yes.

9    Q.    And that's because I assume you spoke to him very

10   clearly and very civilly?

11   A.    Yes.

12   Q.    And you said that he calmed down and he stopped being

13   agitated; and that's when you sent him down to get on the

14   plane, right?

15   A.    Correct.

16   Q.    And now you told us about after he had been removed

17   from the plane or was being removed from the plane.  At no

18   time during that did you see him as a serious threat to

19   yourself, did you?

20   A.    Yes.  When he was threatening us and the firefighters

21   have to have him -- push him up against the wall to hold

22   him there, I feel he's a threat.

23   Q.    Okay.  Sure.  What do you weigh, Officer?

24   A.    About 225.

25   Q.    And you are armed at the time, I assume?

```
 1    A.    Yes.

 2    Q.    And what would you guess Mr. Runner weighs?

 3    A.    A hundred forty.

 4    Q.    And I don't want to be insulting, but he's an elderly

 5    gentleman, would you agree with me?

 6    A.    Yes.

 7    Q.    Okay.  Physically he didn't present any threat to you,

 8    did he?

 9    A.    You got to understand when people are upset and I

10    don't know if they are on medications or drugs, yes, they

11    can be very strong.

12    Q.    He didn't have any weapons?

13    A.    No.

14    Q.    He didn't make any movements with any weapons to

15    attack you?

16    A.    No.

17    Q.    Or anybody else that you saw?

18    A.    No.

19              MR. DEMIK:  No further questions, Your Honor.

20              THE COURT:  Any followup, Mr. Kelderman?

21              MR. KELDERMAN:  Your Honor, may I visit with Mr.

22    Demik?

23              THE COURT:  That's fine.

24                      REDIRECT EXAMINATION

25    BY MR. KELDERMAN:
```

1  Q.   Officer, what city and state is the Rapid City

2  Regional Airport in?

3  A.   City of Rapid City, South Dakota.

4           MR. KELDERMAN:  No other questions, Your Honor.

5           THE COURT:  Anything else, Mr. Demik?

6           MR. DEMIK:  No, Your Honor.

7           THE COURT:  Very well, Officer Hatzenbuhler.

8  Thank you very much.  You may step down.

9           MR. KELDERMAN:  Your Honor, may the witness be

10  released?

11           THE COURT:  Yes.  Any objection to that, Mr.

12  Demik?

13           MR. DEMIK:  None, Your Honor.

14           THE COURT:  Thank you, Officer.  You are released

15  from this case.

16           MR. KELDERMAN:  Xxxxxxxxxxxxxxxx is my next

17  witness.

18           THE DEFENDANT:  Judge, when it comes time I would

19  like to testify.

20           THE COURT:  Yes, when we get to that point,

21  Mr. Runner, you can most certainly testify.

22           THE DEFENDANT:  Thank you.

23           THE COURT:  Thank you.

24      Xxxxxxxxxxxxxxxx, GOVERNMENT'S WITNESS, SWORN

25                    **DIRECT EXAMINATION**

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

```
 1    BY MR. KELDERMAN:

 2    Q.    Good afternoon.

 3    A.    Hi.

 4    Q.    Will you state your name for the record and spell your

 5    last name, please.

 6    A.    Xxxxxxxxxxxxxxxxx.

 7    Q.    Where do you live, ma'am?

 8    A.    Rapid City.

 9    Q.    Back on March 28, 2014, do you remember that day?

10    A.    Yes.

11    Q.    Were you living in Rapid City at that time?

12    A.    Yes.

13    Q.    Did you go to the airport that day?

14    A.    Yes.

15    Q.    Which airport?

16    A.    Rapid City Regional.

17    Q.    Where were you headed that day?

18    A.    To Denver.  You want to know my final destination,

19    too?

20    Q.    No.  Where was that flight headed to?

21    A.    It was Rapid City/Denver.

22    Q.    Where were you working at that time?

23    A.    I actually worked at Mileage Plus for United Airlines.

24    Q.    Do you work there now?

25    A.    No.
```

```
 1    Q.   Do you work somewhere else?

 2    A.   Yes.

 3    Q.   Where?

 4    A.   National American University.

 5    Q.   How are you -- were you a United Airlines employee?

 6    A.   How long was I?

 7    Q.   At that time were you a United Airlines employee?

 8    A.   Yes.

 9    Q.   As an employee, what status do you generally fly with

10    United Airlines?

11    A.   Standby.

12    Q.   Standby.  Thank you.  On March 28 of this year, were

13    you flying standby?

14    A.   Yes.

15    Q.   Who were you with?

16    A.   My husband.

17    Q.   What is his name?

18    A.   Xxxxxxxxxxxxxxx.

19    Q.   Flying standby, what does that mean when you are in

20    the airport?

21    A.   So basically you can sign up for a flight.  If there's

22    an empty seat on the plane they call your name when the

23    plane is full and you get on the plane or not.

24    Q.   If there's availability?

25    A.   If there's availability you get a seat on the plane,
```

1    yes.

2    Q.    You are kind of last in line?

3    A.    Correct.

4    Q.    Were you and xxxxxxx flying standby and last in line

5    that day?

6    A.    Correct, yes.

7    Q.    What were you doing leading up to the last minutes

8    before the flight?

9    A.    We were just waiting, hoping there were two extra

10   seats so we could go on our trip.  Just waiting.

11   Q.    While you were waiting, what did you hear?

12   A.    Basically it was normal.  They were paging a passenger

13   waiting for the flight.  They paged Kennedy Runner.  I

14   think that was the only passenger they were waiting for to

15   release the extra seats to us.

16   Q.    Did you later find out -- did you see another

17   individual come, then -- as you stood and waited, did

18   another individual come to that gate?

19   A.    Yes.

20   Q.    That individual, do you see him here in court today?

21   A.    Yes.

22   Q.    Would you point to him and identify him by something

23   he is wearing?

24   A.    It would be the gentleman sitting in front of me with

25   some stripes and orange long sleeves.

1          MR. KELDERMAN:  Your Honor, may the record once

2     again reflect the identification?

3          THE COURT:  Yes.

4          MR. KELDERMAN:  Thank you.

5     Q.   All right.  Did that person get on the plane?

6     A.   Yes.

7     Q.   Did you know him that day?

8     A.   Did I know him personally?   No.

9     Q.   You just heard a name over the intercom?

10    A.   Yes.  They paged him multiple times, so it kind of

11    stuck with you.

12    Q.   That individual got on the plane, did you say?

13    A.   Yes.

14    Q.   Did you then get on the plane?

15    A.   Yes.

16    Q.   Describe your location and that individual's location

17    on the plane, please.

18    A.   Okay.  So my location I was sitting on the window

19    seat; it's two rows of seating on one side and one row of

20    seating on the other; small plane.

21    Q.   You are using your hands, and I'm just going to ask

22    you if I am describing that correctly.  As you face the

23    front of the aircraft, are there two rows on the right side

24    of the aisle?

25    A.   Yes.

1    Q.    Then one row on the left side of the aisle?

2    A.    Yes.

3    Q.    Where did you sit?

4    A.    I was on the right side by the window.

5    Q.    What row?

6    A.    Row 3.  It's a bulkhead seating, so there was no one

7    else in front of us.

8    Q.    You were basically in the front of the aircraft, then?

9    A.    Yes.

10   Q.    Xxxxxxx, where did he sit?

11   A.    Right next to me, row 3, right side.

12   Q.    He was along the aisle?

13   A.    Aisle seat.

14   Q.    And the gentleman that you pointed to earlier, where

15   did he sit?

16   A.    He was one row back, so row 4, then in the single seat

17   on the left of the aisle.

18   Q.    A little behind you?

19   A.    Yep.

20   Q.    As you boarded and as the other people are boarding

21   the plane -- well, you were one of the last on?  Is that a

22   yes?

23   A.    Yes.

24   Q.    What happened?

25   A.    We were the last ones on, so we were getting situated.

1    Of course, you kind of look around to people around you,

2    you know, as you are getting yourself situated.  We did

3    notice that the gentleman was having issues fitting his

4    carry-on underneath the seat.  The flight attendant tried

5    to assist him.  He seemed to be a little frustrated and not

6    want to put his carry-on items underneath; or he wanted to

7    put them underneath the seat, he did not want them in the

8    overhead bin.  He wasn't really cooperating with the flight

9    attendant.  The captain had at that point come out and took

10   his items and put them away for him.

11   Q.   In an overhead bin?

12   A.   In an overhead bin, yes.

13   Q.   What else happened after that, then?

14   A.   So basically, you know, we were just sitting there

15   ready for takeoff.  The flight was all ready to leave, so

16   everyone was anxious to get going.  The gentleman was kind

17   of rambling on just about general life topics, personal

18   history; said his age a couple of times, said he used to be

19   better looking than Elvis Presley; just randomness.

20   Q.   Was it somewhat -- describe the tone of voice being

21   used; when you say "he," is this the gentleman you pointed

22   to earlier?

23   A.   Yes.

24   Q.   Can you describe his tone of voice?

25   A.   I would say it was a pretty even tone, not getting

 1    overly excited, or anything like that.  Just basically

 2    talking out loud for anybody who will listen.

 3    Q.   Was there a point where he started raising his voice

 4    more?

 5    A.   There was a point.  We were waiting to be de-iced or

 6    we were de-iced.  The guy sitting behind us, they had two

 7    dogs underneath the seat.  One of the dogs started whining

 8    and the gentleman behind me said to his dog, like, "Oh, no

 9    crying."  Just plain, calm, and simple.  And then the

10    gentleman basically said -- got escalated then.  "I am not

11    crying.  I am a grown man."  Very loud and escalated.

12    Q.   The "gentleman," are we talking again about who you

13    pointed to earlier?

14    A.   Correct.

15    Q.   If I call him Mr. Runner, then we will be clear on it.

16    Is that okay for you?

17    A.   Yes.

18    Q.   All right.  Before that, before the de-icing, were you

19    watching Mr. Runner's contacts or involvement with the

20    flight attendant?

21    A.   Yeah.  So when she had come over to help him with his

22    carry-on, Mr. Runner had, you know, not been cooperating;

23    didn't want to put his, like I said, his carry-on where she

24    was asking him to.  She had walked away at that point.  And

25    he did make a comment saying that he was a white male

```
 1    superior to Asians.  The flight attendant was of Asian,

 2    Oriental descent.

 3    Q.    Did the flight attendant acknowledge that?

 4    A.    No.  I am not sure she heard or she choose not to

 5    acknowledge.  I don't know.

 6    Q.    Did she on go about her business?

 7    A.    Yes.

 8    Q.    At some point did the cabin door, outside door to the

 9    aircraft where people got on, did that close?

10    A.    Yes.

11    Q.    Who closed it?

12    A.    The flight attendant.

13    Q.    Did you notice any other doors closing?

14    A.    Obviously, the door to the cockpit closes.

15    Q.    How many doors were there to the outside of this

16    aircraft?

17    A.    Just the one.

18    Q.    So that door closed?

19    A.    Yep.

20    Q.    Did the plan push back from the --

21    A.    Yes.

22    Q.    -- jetway?

23    A.    Yes.

24    Q.    After that happened, did you observe or hear anything

25    from the defendant?  I will stop, I'm sorry.  Before this
```

1    comment about the dog, did you hear the defendant talking?

2    A.    Yes.

3    Q.    What kind of things were going on at that point?

4    A.    It was just normal talking, just randomness about his

5    life, his age, just talking to talk.

6    Q.    On the way to de-icing?

7    A.    Correct.

8    Q.    Did his voice get escalated or raised at any point?

9    A.    During that time frame?   No.

10   Q.    What were other people on the plane doing?

11   A.    Everyone was pretty much just trying to ignore the

12   situation; not trying to draw attention.  You know, you are

13   not going to stare at anybody for talking because they are

14   talking.  Just trying to let the situation go and maybe no

15   attention paid would mean quiet for the rest of the flight.

16   Q.    Let's go to this gentleman behind you that had a dog;

17   was there more than one dog?

18   A.    There were two dogs.

19   Q.    Two gentlemen?

20   A.    Two gentlemen, two dogs.

21   Q.    They would have been in the seats in row 4 directly

22   behind you and your husband?

23   A.    Yes.

24   Q.    And I believe you said that one of them told the dog,

25   "No crying"?

1    A.    Yes.

2    Q.    Was that a loud comment to the dog?

3    A.    No.  It was very soft and simple.  It was basically,

4    "Oh, no crying."  Just trying to get his dog to calm down

5    because planes can be uncomfortable for dogs, I guess.

6    Q.    Mr. Runner responded to that?

7    A.    Yes.

8    Q.    What happened then?

9    A.    Mr. Runner basically said, "I am not crying.  I am a

10   grown man."  He said, "I could punch you out."  And he then

11   said, "In fact, I could punch you through him," and "him"

12   meaning the other guy next to the gentleman behind me.

13   Then he then said, "I could kill you both."

14   Q.    What happened to you at that point?

15   A.    At that point I became a little nervous for everybody

16   on the plane.  Basically just -- kind of almost in shock,

17   like, did I really just hear that?  And so I had waved the

18   flight attendant over to talk with her because we were

19   right in the front, so she was obviously right up front

20   with us.  So I had just kind of whispered to her what he

21   had done.  And she just said, "Okay," and acknowledged it

22   and walked away from us.

23   Q.    Did you see what she did next?

24   A.    She picked up the phone to speak to the captain.

25   Q.    How do you know she was speaking to the captain?

1    A.    Because I am familiar with the airline industry.

2    Q.    She picked up a phone and -- is that a yes?

3    A.    Yes.

4    Q.    And what happened after she picked up that phone?

5    A.    I couldn't hear what she had said on the telephone.

6    But we were basically going, obviously, toward the

7    direction of the runway for a little while.  We then heard

8    an announcement from the captain basically saying, "It

9    looks like we are going to return to the terminal just for

10   a moment.  We just need to take -- do something quickly."

11   Didn't allude to anything; just said that we were

12   returning.

13   Q.    Had Mr. Runner stopped talking at that point?

14   A.    Yeah.  He appeared to be more calm after the captain

15   had said that we were going back.

16   Q.    How about -- I'm sorry, after the comment, the one

17   that you mentioned a little while ago, did he continue to

18   talk yet at that point?

19   A.    Yeah.  I don't remember what exactly was said

20   afterwards; I think I was still in a state shock of what I

21   had just heard.  But, yes, it was still loud and continuing

22   on.

23   Q.    His voice was loud, is that what you mean?

24   A.    Correct.

25   Q.    Did the plane turn around?

1    A.    Yes.

2    Q.    Head back to the gate?

3    A.    Yes.

4    Q.    What was Mr. Runner -- what did he appear to be doing

5    when you -- were you looking at him at all?

6    A.    I did not turn around and directly stare at him.  But

7    out of the corner of your eye -- planes are small -- you

8    know, it appeared after the captain had said that we were

9    going back, that he -- Mr. Runner, you know, calmed down,

10   seemed to put his head, like, on the window, as if he knew,

11   you know, that something was wrong.

12   Q.    Did the plane go back to the jetway?

13   A.    Yes.

14   Q.    Or to the gate?

15   A.    Yes.

16   Q.    Did the door open then?

17   A.    Yes.

18   Q.    What happened after the door opened?

19   A.    Law enforcement came on the plane.

20   Q.    What happened then?

21   A.    Basically the officer came on the plane and asked him

22   to stand up.  Again, I did not turn around and stare.  Did

23   not stand up the first time.  The officer then said, "I

24   said stand up," and I peered out of the corner of my eye to

25   almost grab him under the arm and help him to a seat, and

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    they went off the plane.  There appeared to be some noise

2    in the jet bridge after that; loud conversation.  It wasn't

3    audible, but it was loud.

4    Q.   Did you recognize any of the voices coming from the

5    jet bridge or jetway?

6    A.   Yes.

7    Q.   Was one of those Mr. Runner?

8    A.   It appeared so.

9    Q.   Was he yelling?

10   A.   Yes.

11   Q.   After this comment, going back to on the plane, the

12   comment that Mr. Runner made to the gentleman with the

13   dogs, did it appear to you that -- I'm sorry.  Then you

14   reported it to the flight attendant.  Did it appear that

15   people were concerned?

16   A.   I thought so just because, obviously, it's never a

17   comfortable situation when you hear something like that in

18   close quarters, especially when you are about to go in the

19   air, so it wasn't a good situation to be in.  So

20   ultimately, I thought it was the right thing to do to tell

21   the flight attendant that threats were made because it

22   would not have been a safe situation had something

23   escalated in the air.

24   Q.   Do I take you to mean that you were concerned for your

25   safety as well?

1   A.   Yes.

2   Q.   This is a strange question, ma'am.  Rapid City

3   Regional Airport, what county is that in?

4   A.   Pennington.

5        MR. KELDERMAN:  Nothing else, Your Honor.

6        THE COURT:  Do you wish to inquire, Mr. Demik?

7        MR. DEMIK:  Yes, Your Honor.

8                    **CROSS-EXAMINATION**

9   BY MR. DEMIK:

10  Q.   Ma'am, there's no disputing this was an uncomfortable

11  situation, right?

12  A.   Yeah, it was uncomfortable.

13  Q.   But we aren't talking about a situation here where

14  other passengers took Mr. Runner down like we have heard in

15  news reports in other flights; that didn't happen, did it?

16  A.   No other passenger made physical contact with

17  Mr. Runner, if that's what you are asking.

18  Q.   Nobody had to restrain him on the plane prior to law

19  enforcement getting there?

20  A.   Correct.

21  Q.   If I hear you correctly, it sounds like people just

22  kind of shut up because it was pretty awkward that this

23  crazy man was talking to himself and others, is that right?

24  A.   Yeah.  Nobody was going to engage in conversation.

25  Q.   Okay.  But I guess what I am trying to say is that you

1    or no one else on that flight felt it necessary to get up

2    and take him down or restrain him or do anything like that,

3    right?

4    A.    During the initial first conversation where he was

5    just casually talking?

6    Q.    At any point.

7    A.    Nobody was going to touch him.  We were all passengers

8    on a plane, you know, letting the stewardess and the

9    captain control the flight as it should be.

10   Q.    Sure.  I don't mean to confuse the issue.  Nobody felt

11   threatened enough to walk over and physically restrain

12   Kennedy Runner, am I correct?

13   A.    We were all in our seats, told to keep our seat belts

14   on; so nobody was going to get up.

15   Q.    My question was:  nobody physically felt the need to

16   get up and restrain this man, is that correct?

17   A.    I can't tell you what anybody else felt.

18   Q.    Okay.  Did anybody do that?

19   A.    Nobody got up out of their seat to physically make

20   contact with Mr. Runner.

21   Q.    You didn't see anybody take their seat belt off and

22   walk over, correct?

23   A.    Correct.

24   Q.    You didn't see anybody lay their hands on him,

25   correct?

 1   A.   Correct.

 2   Q.   You didn't see anybody walk down the aisle saying,

 3   "What's the danger here; can I help," did you?

 4   A.   No.

 5   Q.   You didn't see anybody say, "Boy, this is a dangerous

 6   situation.  We better restrain this guy."  You didn't see

 7   any of that, did you?

 8   A.   Nobody got out of their seats.

 9           MR. DEMIK:  That's all I have.  Thank you.

10           THE COURT:  Any followup?

11           MR. KELDERMAN:  No, Your Honor.

12           THE COURT:  May xxx xxxxxxxx be released as a

13   witness?

14           MR. KELDERMAN:  Yes, Your Honor.

15           MR. DEMIK:  Yes, Your Honor.

16           THE COURT:  Thank you.  Xxx xxxxxxxx.  You are

17   free to go.

18           THE DEFENDANT:  We just heard more lies from her.

19           THE COURT:  We will hear from you pretty soon,

20   Mr. Runner.  Be patient with us, please.

21           MR. KELDERMAN:  Xxxxxxx xxxxxxxx.

22           Xxxxxxx xxxxxxxx, GOVERNMENT'S WITNESS, SWORN

23                      **DIRECT EXAMINATION**

24   BY MR. KELDERMAN:

25   Q.   Will you state your name for the record.

                    JUDITH M. THOMPSON
            (605) 348-8610     FAX  (605) 343-6842

```
 1    A.    Xxxxxxx xxxxx xxxxxxxx.

 2    Q.    Where do you live?

 3    A.    Rapid City, South Dakota.

 4    Q.    Where do you work?

 5    A.    National American University.

 6    Q.    Xxx xxxxxxxx, I am going to go back to March 28, 2014.

 7    Do you remember that day?

 8    A.    Yes, I do.

 9    Q.    What were you doing that day?

10    A.    Flying out of Rapid City.

11    Q.    Early in the morning?

12    A.    Yeah.

13    Q.    Where were you flying to?

14    A.    Trying to make it to Fargo.

15    Q.    Where were you --

16    A.    Denver; to Denver.

17    Q.    What flight status were you that day?

18    A.    We were nonref, which mean you have to wait for a seat

19    to open up on the plane.

20    Q.    Is that also known as standby?

21    A.    Yes.

22    Q.    Why do you fly standby?

23    A.    My wife used to work for United Airlines, so we have

24    to -- to fly for free you fly that way.

25    Q.    What is your wife's name?
```

1    A.    Xxxxxxx xxxxxxxx.

2    Q.    So flying standby, would that mean you were waiting?

3    A.    Yes.  You are the last person on the plane.  Most of

4    the time when you are nonref you have to wait for an open

5    seat.

6    Q.    While you were waiting, did you hear things on the

7    intercom at the airport?

8    A.    Yeah.  They called people that aren't on the plane;

9    they call them if they are not ticketed passengers, they

10   call them over the intercom there, so they were calling

11   passengers on to the plane.

12   Q.    This is out at the Rapid City Regional Airport, is

13   that true?

14   A.    Correct.

15   Q.    Was your flight -- were you specifically waiting for

16   someone?

17   A.    They were waiting for a gentleman to get on the plane;

18   he was waiting to board; and he was the last one to clear,

19   so they finally got ahold of him and got him on the plane.

20   Q.    Were you standing near the gate when that gentleman --

21   A.    We were sitting near the gate, yes.

22   Q.    Did you -- you said that gentleman -- do you see that

23   gentleman here in court today?

24   A.    Yes, that man there.

25   Q.    Could you identify him by what he's wearing?

1    A.    The man in the striped shirt.

2    Q.    After that person -- I guess, did that person go

3    through the gate?

4    A.    Yes, they got on the plane.  When they finally called

5    him in, he boarded the plane.

6    Q.    Did you then get on the plane?

7    A.    Yes.

8    Q.    What happened when you got on the plane?  What did you

9    notice?

10   A.    Well, we sat down and the first thing I noticed as I

11   was sitting down is the man -- was the flight attendant was

12   trying to get him to put his overhead stuff in the overhead

13   bin.  He was being very obtrusive to her.  He said

14   something to the effect of, "I am a white male.  I don't

15   have to.  I am better than you," basically.  The flight

16   attendant was an Asian lady.  And he said, "I am a supreme

17   white male."

18   Q.    Did you know that man that day?

19   A.    No.

20   Q.    Have you come to learn his name since then?

21   A.    Yes.

22   Q.    What name do you know him to go by?

23   A.    Kenneth Runner.

24   Q.    Kennedy Runner?

25   A.    Yeah.

1    Q.   If I call him Mr. Runner, is that the gentleman over

2    there in the stripes you identified?

3    A.   Correct.

4    Q.   So Mr. Runner and the flight attendant were having

5    conversations?

6    A.   Yes.  She was trying to get him to put his stuff in

7    the overhead bin and he didn't want to do that.

8    Q.   Did someone else get involved?

9    A.   After repeated tries, she finally had talked to the

10   pilot and the pilot came out asked him to put his stuff

11   away.  And then from there on it was put away into the bin;

12   I believe that the pilot helped him do that.

13   Q.   What did the flight attendant do then?

14   A.   She was busy running about the normal, trying to get

15   the flight ready for takeoff.  When the pilot went back,

16   she tried to get Mr. Runner to put his seat belt on and he

17   was very combative about that.  He didn't want to put his

18   seat belt on.  She asked him a couple times, and he said he

19   didn't want to put his seat belt on.

20   Q.   Eventually did he put his seat belt on?

21   A.   Yes.

22   Q.   To your knowledge?

23   A.   To my knowledge.

24   Q.   What did the flight attendant do at that point?

25   A.   He's being very loud and causing a disturbance, I

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    guess you could say.  She came to us and told us, "Ignore

2    him and maybe he will calm down."  That's pretty much what

3    she did.

4    Q.   Where were you seated on this plane?

5    A.   We were in the bulkhead in the first two front seats;

6    I don't remember the row it was on; the very front first

7    two seats on the right-hand side.

8    Q.   Mr. Runner, where was he seated from you?

9    A.   I believe he was on the left-hand side seat behind us.

10   Q.   On the other side of the aisle?

11   A.   Yes, on the other side of the aisle.

12   Q.   Describe how many --

13   A.   One side it has one seat the whole way down and then

14   on the right side it has two seats all the way to the back.

15   Q.   Were you on the aisle?

16   A.   I was on the aisle, right.

17   Q.   Did the door close to the outside of the plane?

18   A.   Yes.

19   Q.   Is that the door where you entered the plane?

20   A.   Correct.

21   Q.   What happened after that door closed?

22   A.   After the door closed, there were two gentlemen

23   sitting behind us.  We were taxi'g to de-ice and two

24   gentlemen behind us had a dog that was crying.  And I don't

25   remember exactly how it was worded, but they were telling

```
 1    the dog to stop crying.  And I don't know if Mr. Runner
 2    thought they were talking to him, but he was getting very
 3    combative with the two gentlemen behind me.  I am not
 4    sure --
 5              THE DEFENDANT:  All lies.
 6    A.   -- all what was said, but eventually what happened is
 7    there was -- he kept getting very loud and said something
 8    to the effect like, "I could kill you,"  and they just kept
 9    ignoring him, but he kept getting riled up.
10    Q.   Was there anger in his voice?
11    A.   Yes.  He was -- over the whole period of time he was
12    getting louder and louder and he kept rambling on stuff
13    that it was pretty much the whole time rambling on while we
14    were waiting to get de-iced.
15    Q.   In a calm tone of voice or not?
16    A.   No.
17    Q.   Were you concerned?
18    A.   Yes, just a little bit.  Yes, we were concerned enough
19    to call the flight attendant over and explain to her that
20    he had said something about the passengers behind us and
21    that he said he could possibly kill somebody.  She kept
22    instructing us to ignore him; maybe he would settle down.
23    Q.   Did she go up to the front of the aircraft?
24    A.   Yes, she did.  She went up -- there's a seat right
25    next to the door that you come into and she sat down and
```

1    got on the phone.

2    Q.   What happened after that with the plane?

3    A.   Eventually we were turned around and went back to the

4    jetway.  I knew something was going on because when I

5    looked out the door and there was a bunch of people

6    standing outside of the jetway.

7    Q.   Including?

8    A.   There was police officers there.

9    Q.   Did the plane go back to the gate?

10   A.   Yes.  We were returned to the gate.  Everybody sat

11   there and then the police officer came on to the plane and

12   they got past Mr. Runner, then they took him off the plane.

13   And the last thing I remember when we got to the jetway we

14   heard a loud holler.

15   Q.   Whose voice do you think that holler was?  Did you

16   recognize it?

17   A.   Yeah, that was Mr. Runner's voice.

18   Q.   I just want to make sure that I ask this.  Did the

19   flight attendant close the door to the airplane earlier?

20   A.   Yes.  Yes, after we boarded the plane.

21   Q.   Then the plane went over to de-icing?

22   A.   Yes.  We were taxi'g to get ready to de-ice and take

23   off.

24   Q.   When you went back to the gate, did she have to open

25   it again?

1    A.   Yes.

2              MR. KELDERMAN:  Nothing else at this time, Your

3    Honor.

4              THE COURT:  Mr. Demik.

5                         **CROSS-EXAMINATION**

6    BY MR. DEMIK:

7    Q.   I just want to ask you a question.  I am not trying to

8    quarrel in any way.  If it's unclear, let me know.  Beside

9    his words -- he has an agitated voice, right?

10   A.   Yes.

11   Q.   He was saying some troubling things?

12   A.   Yeah.

13   Q.   Besides his words, did you see him make any physical

14   movement that was threatening?  Like, did he get up out of

15   his seat to attack the men behind him?

16   A.   No.

17   Q.   Did he make any fists to hit anybody or anything?

18   A.   Not that I recall.

19   Q.   So besides his words, you didn't see him make any

20   threats at anybody?

21   A.   Not that I recall.

22             MR. DEMIK:  That's fine.  Thank you, sir.

23             THE COURT:  Any followup, Mr. Kelderman?

24             MR. KELDERMAN:  No, Your Honor.

25             THE COURT:  May this witness be released?

1          MR. KELDERMAN:  Yes, Your Honor.

2          MR. DEMIK:  Absolutely.

3          THE COURT:  Xxx xxxxxxxx, thank you.  You are

4    free to go now.  Mr. Kelderman.

5          MR. KELDERMAN:  Your Honor, I have one more.  Mr.

6    Demik and I have spoken about this.  I have an affidavit

7    from the pilot of flight 6089; an affidavit which he

8    recites what occurred from his perspective on that date.

9    It was signed yesterday and notarized in place in Tennessee

10   where he resides.  Mr. Demik and I have stipulated this may

11   be admitted.  I offer it to the Court at this time as

12   Exhibit 1.

13         THE COURT:  Is that agreeable to you, Mr. Demik?

14         MR. DEMIK:  Yes, Your Honor.  I decided not to

15   question the qualifications in my home state, yes.  I

16   stipulate to its admission.

17         THE COURT:  That's tantamount to judicial notice.

18         MR. DEMIK:  You can never tell the Tennessee

19   notaries.  I stipulate to that.  We are amenable to that.

20         THE COURT:  Coffee County.  Well, Exhibit 1 is

21   received.

22         MR. KELDERMAN:  I just need one moment, Your

23   Honor.

24         THE COURT:  Take as much time as you need.  You

25   spent a lot of time in this courtroom in the last

                    JUDITH M. THOMPSON
          (605) 348-8610     FAX  (605) 343-6842

1    two weeks.

2           MR. KELDERMAN:  Your Honor, at this time the

3    United States rests.

4           THE COURT:  Mr. Demik, do you wish to proceed?

5           MR. DEMIK:  I do, Your Honor.  I should lay

6    something for the record first.  I researched this.

7    Mr. Runner and I have discussed it and I know there's some

8    statements in a forensic evaluation that was done by Dr.

9    Zilberman which Mr. Runner expresses his -- not to raise an

10   insanity defense.  However, since that date I have

11   discussed it with Mr. Runner and I'd like to put it on the

12   record that he has agreed to allow me to raise two defenses

13   to the Court.  He wants me to ask the Court for a not

14   guilty verdict, but he's going to allow me to argue in his

15   behalf as his lawyer to ask the Court for a not guilty by

16   reason of insanity verdict.  So ethically, I can't do that

17   without his consent.   He's going to allow me to make that

18   argument to the Court.

19           In support of that, Your Honor, I have two

20   exhibits.  I have submitted a copy to government counsel

21   and to the Court.  The first Exhibit 101 is a forensic

22   evaluation by Dr. Zilberman, the one I referenced, on the

23   issue of sanity.  And the second is a report done by Dr.

24   Manlove on the same topic reaching the same conclusion and

25   that's Exhibit 102.  So at this time I would move those

1    into evidence, I believe, by stipulation, Your Honor.

2           THE COURT:  The Exhibit 101 appears to be the

3    forensic report regarding legal sanity for Mr. Runner by

4    Dr. Zilberman dated September 24, 2014.  Any objection to

5    the admission of Exhibit 101, Mr. Kelderman?

6           MR. KELDERMAN:  None, Your Honor.

7           THE COURT:  Exhibit 101 is received.

8           Exhibit 102 is Manlove Psychiatric Group, a

9    forensic psychiatric evaluation of Mr. Runner, performed --

10   with a date of completion of October 20, 2014.  Any

11   objection to Exhibit 102, Mr. Kelderman?

12          MR. KELDERMAN:  No, Your Honor.

13          THE COURT:  Exhibit 102 is received.

14          Mr. Demik.

15          MR. DEMIK:  Secondarily, Your Honor, my client

16   has expressed his desire in court and myself to testify, so

17   at this time I am going to call Kennedy Runner.

18          THE COURT:  Very well.  Mr. Runner, you may

19   testify from where you are, sir.  That is perfectly fine.

20          Please proceed, Mr. Demik.  We need to place

21   Mr. Runner under oath.

22          KENNEDY RUNNER, DEFENDANT HEREIN, SWORN

23                    **DIRECT EXAMINATION**

24   BY MR. DEMIK:

25   Q.   I am going to ask you questions from here.  You need

                    JUDITH M. THOMPSON
            (605) 348-8610     FAX  (605) 343-6842

1    to speak into the microphone.  How old are you, sir?

2    A.   I am 58.  I will be 59 in December.

3    Q.   You wanted to talk about some of your medical issues.

4    Can you go ahead and tell the Court what those medical

5    issues are?

6    A.   Well, medical issues.  Physical health or mental

7    health?

8    Q.   Both.

9    A.   Well, when I was young, I was 21 years old, or

10   something, approximate, I was diagnosed with paranoid

11   schizophrenia.  And they went with that for 15, 20 years,

12   then they changed it to no, you are no longer paranoid

13   schizophrenic, you are manic depression.  The last thing I

14   have heard recently they say that I am unspecified

15   psychosis and I don't know what that is.  And I don't know

16   which one, psychosis.  I don't think I am mentally ill; I

17   never have been; I am not now; I don't plan on being

18   mentally ill.

19          As far as physical health, I have had heart

20   attacks.  I don't know how many, at least five or six heart

21   attacks.  I've had chronic bronchitis, varicose veins,

22   hemorrhoids, lost a lot of weight.  I am down now, though;

23   I am back up a little bit to a 165 pounds.  I'm in poor

24   health physically.  And whatever that is, you can find out

25   what psychosis it is, the unspecified psychosis, what my

1    mental is.  They give me Risperdal, Cogentin; and once a

2    month a shot of Haldol in my arm, a psychiatric medicine.

3            I want to say I am not going to lie about what

4    happened that day at the airport.  The airport shuttle

5    picked me up and they made two stops picking people up

6    after me.  I looked at my watch and it was 5:00 a.m.  I

7    told the driver at 5:30 we have to board the plane.  All

8    right.  When we got to the airport, I had 13 minutes to

9    board that plane; 5:30 boarding.  I went in there.  United

10   Airlines has two long lines of people buying tickets.  I am

11   not cutting in front; I already bought the ticket.  I just

12   want to catch the plane.  She said go to the escalator up

13   and to the right.  I went up there.

14           First this young man -- I had -- my luggage was

15   underneath the plane, two of them.  And I had a box of a CD

16   player FM radio; brought it with me.  It went under the

17   plane.  This young man, I showed him that.  I asked him

18   four times which way after you go through the metal

19   detector, and that stuff, which way to the plane?  I asked

20   him four times and he wouldn't tell me.  I had to sit down

21   and talk to this lady, United Airlines employee.  They

22   wanted to know why I was sold a ticket without an ID.  I

23   told them, "Call them up there at United Airlines and they

24   will tell you."  They didn't do that.  Instead, I'm sitting

25   there answering her detailed questions.  First she asked me

1    where is my home?  I said it's not an apartment, it's not a

2    house, it's motels.  Okay.  She wanted to know about -- I

3    told everyone knows my family.  She wanted to know.  My

4    mother and father were dead.  I have a brother that's

5    71 years old and lives in Virginia.  I gave her his

6    address; xxxx xxxxx xxxxxx xxxxx, Hopewell, Virginia 23860.

7    Even the phone number, I gave her his phone number.  She

8    wanted to know how to get to his house; he's married to his

9    wife, Brenda.  I said that you go to Hopewell about 10

10   feet; you see a brick wall that says Beachwood Manor

11   Subdivision; turn left in there; go two or three blocks and

12   you'll come to xxxxx xxxxxx xxxxx.  I can't remember the

13   name of that street they are on when you turn left and she

14   insisted.  I had to say two or three times to her before

15   she finally got it.

16   Q.   So Mr. Runner, that was when you were getting your

17   ticket before you got on the plane, right?

18   A.   I had the ticket.  I bought it the evening before.

19   And United paid for this time for a motel room, at a motel

20   in Rapid, $58 a night.

21   Q.   Could I talk to you about happened?  Can I ask you

22   about what happened on that flight?

23   A.   Yeah.  Go ahead.

24   Q.   Now, you wanted to say that those people were lying so

25   why don't you tell the Court what happened on the plane,

1    because that's what we are here to talk about.

2    A.    That one was lying, too.  I'll tell you.  After going

3    through him and her, I run -- I had taken United Airlines

4    planes six different times in my life time.  U.S. Airways

5    twice and Jet Blue once.  I didn't mind going through the

6    metal detector.  I got through there.  Then the intercom in

7    the airport:  Kennedy Runner board the plane.  I had to put

8    my belt on and shove the stuff in my pockets.  I got to the

9    plane, I got on the plane and was seated in the plane.  It

10   was a single seat, no window.  At any rate, I thought it

11   was all right.  But I had this -- it was a cardboard box; I

12   had the stereo in the big box.  I thought it was too big to

13   fit in the upper compartment, that was all it was.  She was

14   able to get it in there, turn it sideways.  She told me

15   that the plane would take off in two to three minutes.  I

16   am sitting there waiting for the plane and I am talking --

17   I am not talking saying anything; I didn't say I'd kill

18   anybody.

19           Instead, this man and a police officer board the

20   plane, escort me off the plane, put handcuffs on me, and

21   take me to jail, Pennington Jail.  That's what happened.

22           All that other stuff they are talking about is

23   lying, lying.  I told you what happened and only what

24   happened.  Instead, one more fact.  They had me off the

25   plane and not before.  We were in a room and this man was

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

 1    on the phone calling the FBI.  And I asked him, "Did they

 2    have anything against Kennedy Runner?"  And he said, "No."

 3    And he hung up and told us the FBI says they had nothing

 4    against Kennedy Runner, which was me.  That's a fact, too.

 5    That's all that happened.  All that other stuff is

 6    imaginary or lies.  I think they need a psychiatrist.

 7              Perjury, I know what perjury is.  If you lie

 8    under oath it's perjury.  You can go to jail, or prison, or

 9    the penitentiary, depending on how much lying you do.

10    Them, not me.

11              I'll shut up now.  I will be quiet, Your Honor,

12    sir.

13              THE COURT:  Thank you, Mr. Runner.

14    Q.   Kennedy, did you intend to hurt anybody?

15    A.   No, no.  How could I hurt anybody?  58 years old, in

16    poor health; I was down to 140 pounds.  I ain't hurting

17    nobody.  58 years old and a 140 pounds and I am going to do

18    what?  I didn't have no gun, no knife.  I didn't threaten

19    to kill or hurt anybody.  They were threatening to kill me.

20              MR. DEMIK:  No further questions, Your Honor.

21              THE COURT:  Mr. Kelderman.

22              MR. KELDERMAN:  No questions, Your Honor.

23              THE COURT:  Very well.  Did you have any other

24    witnesses or evidence, Mr. Demik?

25              MR. DEMIK:  No, Your Honor.

1          THE COURT:  The defense rests.

2          Mr. Kelderman, is there any rebuttal?

3          MR. KELDERMAN:  No, Your Honor.

4          THE COURT:  Very well.  Well, both sides having

5     rested, I can make a determination in the case.  I read

6     carefully Exhibit 101.  If I could have that back, please?

7     The report of Dr. Zilberman, Ph.D., clinical psychologist,

8     Board-Certified in clinical psychology.  And he's at the

9     Federal Bureau of Prisons Metropolitan Correctional Center

10    in San Diego.  I am familiar with his work.  He's written a

11    thorough report that's been admitted into evidence.

12          And his conclusion is in the last page of the

13    report, page 6, where he concludes in his professional

14    opinion there is objective evidence that Mr. Runner's

15    account of his history, collateral documents, and

16    information from the evaluation to indicate that he was not

17    aware of the nature and quality of his actions during the

18    time period leading to, during, and following the offense.

19    And he goes on and says, "However, based on his statements

20    Mr. Runner may have been aware of the wrongfulness of

21    actions of which he's being accused, though he absolutely

22    denies he engaged in these and explained that he would be

23    in trouble if he did."

24          So the statute at issue here with regard to the

25    defense of not guilty by reason of mental illness is 18

1    United States Code Section 17.  It is the insanity defense

2    statute.  Proper notice was given by the defense under

3    Federal Rule of Criminal Procedure 12.2, that the defense

4    of not guilty by reason of insanity would be raised in the

5    case.  18 United States Code Section A says that it is an

6    affirmative defense to prosecution under any federal

7    statute that at the time of the commission of the acts

8    constituting the offense, the defendant, Mr. Runner here,

9    as a result of a severe mental disease or defect was unable

10   to appreciate the nature and quality of his conduct.  Or,

11   in its disjunctive, or was unable to understand the

12   wrongfulness of his acts.  The burden of proof in the

13   sanity defense is by clear and convincing evidence.

14        Dr. Zilberman does make a diagnosis on page 5 of

15   Exhibit 101 saying on the basis of the available

16   information, Mr. Runner's present diagnosis, according to

17   the Diagnostic and Statistical Manual of Mental Disorders,

18   Fifth Edition, is schizophrenia.  And then he describes the

19   essential features of schizophrenia, delusional beliefs,

20   auditory hallucinations, disorganized speech and behavior,

21   and possibly diminished emotional expression or volition.

22   Schizophrenia involves impairment of one or more major

23   areas of functioning such as work and social life.

24   Individuals with this disorder may lack insight or

25   awareness that they are mentally ill.  In Mr. Runner's

case, a long reported history from family of mental illness and repeated diagnosis of schizophrenia. He was hospitalized twice in the last year and treatment was given for psychotic symptoms. He is being treated -- that was at the San Diego facility -- and is responding very positively to all prescribed psychotrophic medications. Treatment with antipsychotic medications appears to have dramatically improved his condition.

So we have a diagnosis by Dr. Zilberman of schizophrenia, a description of symptoms which certainly align with the behaviors described by Officer Hatzenbuhler and xxx and xxxx xxxxxxxx in this case, and also consistent with the description of Mr. Runner's conduct in Government's Exhibit 1, the affidavit of John Penland, who was the pilot on United flight 6089, Rapid City, South Dakota, to Denver, Colorado, on March 28, 2014.

The Defense Exhibit 102 from Manlove Psychiatric Group dated October 20, 2014, has been received in evidence. Dr. Manlove Psychiatric Group and his work is well-known to this Court. He's testified on many occasions as an expert witness in this court. So the conclusions of Dr. Manlove are certainly credible as well as those of Dr. Zilberman. And on page 9 of Dr. Manlove's report he says, "According to federal law, to be legally insane one must have had a mental illness which made the defendant unable

1   to appreciate the nature and quality or the wrongfulness of

2   his acts at the time of the alleged crime.  To meet this

3   criteria, one must have either been so confused that they

4   do not know their act is wrong or their act must have

5   seemed right within the context of a delusion that they

6   had.  At the time of his arrest, Mr. Runner had delusional

7   paranoia which made it seem right to protect himself by

8   threatening people around him who are triggering paranoia

9   and who he was fearful of.  The paranoia was so sever at

10  the time of the alleged crime, that he did not know his act

11  was wrong."  The diagnosis by Dr. Manlove is an opinion

12  based on a reasonable degree of medical certainty.  It's on

13  page 8.  Dr. Manlove says, "It is my opinion with

14  reasonable medical certainty that Kennedy Runner met the

15  federal criteria for insanity at the time of the alleged

16  crime.  I base this on reasoning below."  And then he sets

17  out a thorough description of the agitated state and

18  psychosis from which Mr. Runner was suffering at the time

19  of the offense alleged in the indictment.  So psychiatric

20  evidence is clear and convincing.

21          I also find that this series of events did occur

22  on March 8, 2014.  That Mr. Runner was at Rapid City

23  Regional Airport in Pennington County, South Dakota.  The

24  events occurred on March 28, 2014.  That the event did

25  occur at the Rapid City Regional Airport in Rapid City,

1    South Dakota, for United Airlines flight 6089 from Rapid

2    City, South Dakota, to Denver, Colorado.

3              I further find based on Exhibit 1, the affidavit

4    of the pilot, John Penland, that the flight attendant had

5    reported the event to him and that information from the

6    affidavit is consistent with the testimony of xxx and xxxx

7    xxxxxxxx who were on board the flight and observed

8    Mr. Runner's behavior.  It does confirm threats of

9    violence and the pilot insisting that Mr. Runner putting

10   his carry-on in the overhead bin.  The pilot does confirm

11   in paragraph 6 that once the aircraft cabin doors, the

12   flight deck doors were closed, the airplane is then

13   considered to be under federal jurisdiction.  At that point

14   as pilot, Penland says, "I am in flight security.  I am the

15   in-flight security coordinator and have full authority over

16   all matters related to security of the aircraft."  While

17   the de-icing process ongoing, he says in paragraph 7, the

18   flight attendant notified him over the intercom between the

19   cabin and flight deck that Mr. Runner was making her

20   uncomfortable.   And then he goes onto describe what is

21   consistent with xxx and xxxx xxxxxxxx.

22             He says in paragraph 8 that the pilot viewed the

23   threat toward passengers and the flight attendant as a very

24   serious matter which intimidated both the flight attendant

25   and others into taking action.

1          So we have the factual basis for federal

2    jurisdiction in the case.  We have proper description of

3    the behavior of Mr. Runner from Officer Hatzenbuhler and

4    xxx and xxxx xxxxxxxx.  We have proof of the date of the

5    event, March 28, 2014.  And its location jurisdictionally

6    within the authority of this Court.

7          So I do find beyond a reasonable doubt that the

8    United States has proven each essential element of a

9    violation of 49 United States Code Section 46504 beyond a

10   reasonable doubt.

11          I further find, based on the testimony of Officer

12   Hatzenbuhler, xxx and xxxx xxxxxxxx, the affidavit of the

13   pilot, the forensic report regarding legal sanity,

14   Exhibit 101 from Dr. Zilberman, and the forensic

15   psychiatric evaluation of Dr. Manlove, Exhibit 102, that at

16   the time of the criminal offense, Mr. Runner was acting as

17   a result of a severe mental disease or defect and was

18   unable to appreciate the nature and quality of his

19   behavior.  Or, according to Dr. Manlove, the wrongfulness

20   of his acts.  That mental disease or defect causes me to

21   conclude by clear and convincing evidence that Mr. Runner

22   is not guilty by reason of insanity or mental illness in

23   the case.

24          Do you have anything further for the record at

25   this point, Mr. Kelderman?

1          MR. KELDERMAN:  No, Your Honor.

2          THE COURT:  Mr. Demik?

3          MR. DEMIK:  No, Your Honor.  I did want to

4    address the procedures that we take from here, but I have

5    nothing on the Court's record thus far.

6          THE COURT:  Would you like the mental health

7    exhibits, Exhibits 101 and 102, sealed in the record of the

8    case?

9          MR. KELDERMAN:  Yes, Your Honor.  And I have one

10   additional request that I talked to the Alcanters about.  I

11   would ask the Court redact their names to initials in the

12   transcript, if it's permissible, if it can be done just for

13   their privacy.

14         THE COURT:  Do you have an objection to that, Mr.

15   Demik?

16         MR. DEMIK:  None.

17         THE COURT:  Well, I will order that the witnesses

18   who testified in court, Officer Hatzenbuhler, his name can

19   remain in the record.  He's a law enforcement officer

20   testifying in that capacity.  As to xxx and xxxx xxxxxxxx,

21   they shall be identified in the record of this trial by

22   their initials only.

23         MR. KELDERMAN:  Thank you, Your Honor.

24         THE COURT:  Anything further?

25         MR. DEMIK:  On the sealing issue, Your Honor?

1            THE COURT:  Did you have any objection to sealing

2    Exhibits 101 and 102 or do you request that we do so?

3            MR. DEMIK:  I don't quite know, Your Honor.  My

4    concern is I want those to get to the appropriate mental

5    health professionals as soon as possible.  I don't know if

6    sealing that would hinder that.  I don't have any knowledge

7    on that.  Whatever would accelerate the process here, Your

8    Honor, because the Court is aware we have 40 days from

9    today's date to set a hearing in this matter and without

10   disparaging the Bureau of Prisons, they have a tendency to

11   be dilatory in my experience.  I don't want that 40 days to

12   get extended so as long as sealing does not in any way

13   hinder these reports from getting to the appropriate

14   examiners, Your Honor, I have no objection to it.

15           THE COURT:  Mr. Kelderman, do you have a position

16   on that?

17           MR. KELDERMAN:  Your Honor, they may be sealed, I

18   guess, as long as -- I do agree with Mr. Demik.  I believe

19   as quickly as possible get them to the correct authorities

20   and if there's going to be something that would hinder

21   that, I wouldn't want that to happen.  I believe that

22   sealing is appropriate but, again, the timing is more

23   important.

24           THE COURT:  Yes.  I will seal Exhibits 101 and

25   102 to protect the privacy interests of Mr. Runner.  And

1    they will be sealed in the public record, although, of

2    course, they are available to court users, which would be

3    counsel in the case as well as others in that category.

4    But I also order that Exhibits 101 and 102 and Exhibit 1,

5    which is the affidavit of the pilot and, if necessary, a

6    transcript of the proceedings be made available to any

7    mental health or Bureau of Prisons official with a

8    legitimate need for that information.

9              THE DEFENDANT:  I'd just like to say, Judge, you

10   remain cool, calm.  I hear you.  I can tell.  You remain

11   calm.

12             THE COURT:  Well, I think that is part of my

13   work.

14             THE DEFENDANT:  Well, you are a mature, adult

15   aren't you?  Yes.

16             THE COURT:  I am almost as old as you are.

17             So let's talk about the procedure then, Mr.

18   Demik.  As you have said, we now, with the finding of the

19   Court, have to proceed according to 18 United States Code

20   Section 4243, and we must have a hearing within 40 days of

21   my finding.  That's 18 United States Code Section 4243(c).

22   I also under subsection (b), before that hearing takes

23   place, order that a psychiatric or psychological

24   examination of Mr. Runner be conducted, and that a

25   psychiatric or psychological report be filed with the Court

1    pursuant to the provisions of section 4247(b) and (c), and,

2    of course, those reports will be made available to counsel.

3         So we will be setting a hearing.  I have ordered

4    the required psychiatric or psychological examination under

5    4243(b).

6         Are there further matters you wish to take up?

7         MR. DEMIK:  Yes, briefly.  First of all, Your

8    Honor, I prefer the word verdict.  It makes it sound like I

9    did something as opposed to the Court's finding, but all

10   facetiousness aside, under 4247(b), and this is my concern,

11   Your Honor, is that Mr. Runner, as the Court knows, has

12   been sent to San Diego twice, which has resulted in him

13   staying in custody for seven months and four days, by my

14   calculations now.  There's nothing that I see in the

15   statute that mandates that we have to send him to these far

16   flung geographic locations.  And in fact, Your Honor, if we

17   all look at 4247(b), which is the language that pertains to

18   the examination that we are talking about here, which is in

19   the report that we discussed, within 40 days, what that

20   directs all of us is that, and I quote, "Unless

21   impracticable the psychiatric or psychological examination

22   shall be conducted in a suitable facility closest to the

23   Court."  And my concern is this, Your Honor:  Mr. Runner

24   has already been in the laundry machine at the BOP's mental

25   health process twice now, seven months in custody.  I don't

1    think that's necessary to go through that a third round.  I

2    think the Court can order a suitable facility that is

3    local; at any rate, closer than San Diego, California.

4    That's my first concern is geographic, Your Honor, because

5    I don't want Mr. Runner to spend any more time in custody

6    than what is mandated by the statute, given the Court's

7    verdict.

8            THE COURT:  Let's take that up first.

9            Mr. Kelderman.

10           MR. KELDERMAN:  Your Honor, I see we have -- the

11   statute clearly says the closest possible location.  I had

12   all along expected it would be Dr. Zilberman and I say that

13   because he's now done two examinations of the defendant.

14   It seems like he would be the one in the position where

15   things could be done the fastest.  He knows the most about

16   the defendant; he has got the experience; he's met with

17   him.  I think, if I remember correctly, he reported back

18   that his meetings were on a level where they got along

19   sufficiently, they were able to communicate clearly.  And

20   so all along I was expecting it would be Dr. Zilberman.  I

21   thought it would make the most sense.  I don't know where

22   the closest facility is.

23           THE COURT:  The only facility I am aware of, and

24   I don't know if it's closer, is Springfield, Missouri.  The

25   challenge here, of course, is in the event of a finding

1   that Mr. Runner needs to be committed for purposes of

2   treatment, he would be in the custody of the Bureau of

3   Prisons unless the State of South Dakota would take custody

4   of him.  He's not a resident here, so that seems unlikely

5   to me.  It may be a much smoother course for Mr. Runner if

6   we have continuity with regard to Bureau of Prisons'

7   evaluation.

8            MR. DEMIK:  Well, Your Honor, the same language

9   in 4247 allows this Court to appoint any qualified expert

10  to examine him.  Dr. Manlove has the same -- excuse me --

11  the same qualifications, he has the same continuity with

12  Mr. Runner, he's already evaluated him, and he's local.

13  The continuity is also met if the Court appoints Dr.

14  Manlove and we can get it done much quicker and not miss

15  that 40-day deadline.  And my concern, Your Honor, I don't

16  think it's unfounded, in almost every competency case I

17  have handled resulted in my client staying in custody far

18  beyond the statutory limits, and I don't want that to

19  happen here.  Mr. Runner has already been in jail for

20  seven months.  And I think now we are finally on the same

21  page for some type of rehabilitation.  There's nothing in

22  that statute.  In fact, I would argue that the statute

23  directs the Court to appoint a local examiner and a local

24  facility.

25            Now, the Court is correct, he's in a BOP

1      facility.  But a suitable facility, if we look at it, is

2      defined if 4247 subsection (a)(2).  That definition in that

3      statute says, "Suitable facility means a facility that is

4      suitable to provide care and treatment given the nature of

5      the offense and the characteristics of the defendant."  A

6      facility, not a BOP facility.

7              THE COURT:  Which facility is that?

8              MR. DEMIK:  Whatever the Court can order, Your

9      Honor.

10             THE COURT:  It would be the Pennington County

11     Jail here, which is hardly a mental health facility.

12             MR. DEMIK:  It hardly is, Your Honor.  But if the

13     Court were to appoint Dr. Manlove and Dr. Manlove would be

14     able to evaluate Mr. Runner based on the criteria we are

15     talking about here, I can almost -- well, I can't

16     guarantee; I haven't spoken to him.  But we would be

17     well-prepared in 40 days to address that issue.  If he's

18     sent to, San Diego, Your Honor, I am not sure we are going

19     to meet that 40 days.

20             And I will stipulate, and I believe Mr. Runner

21     would too, that he's fine staying here in Pennington County

22     to conduct that examination rather than be sent to San

23     Diego, California.

24             THE DEFENDANT:  Judge, my Master Card direct

25     express card, I got almost $9,000.  I am saying I can pay

1        for staying at a motel here in Rapid City and go in and out

2        to see the psychiatrist.  If I don't, you can rearrest me.

3              THE COURT:  Yes.  I am required to commit you to

4        the custody of the attorney general for placement in a

5        suitable facility, so I can't permit you at this point with

6        a 4243 commitment for study to a local motel.

7              I understand your concerns, Mr. Demik, and I

8        trust Dr. Manlove, but I am concerned that what we'll run

9        into, unless the Bureau of Prisons conducts this follow-up

10       evaluation as required by statute, we are going to run into

11       some sort of a problem down the road that he's going to

12       have to be reevaluated at a Bureau of Prisons facility so

13       that they can take a position with regard to the issues

14       that will be before us next at the hearing.  So I am going

15       to deny the request for him to remain in a local facility.

16       Actually we don't have a local mental health facility that

17       would be suitable, although we have a local psychiatrist,

18       Dr. Manlove, who is suitable.  So I am going to deny the

19       request and commit Mr. Runner to the custody of the

20       attorney general for purposes of psychiatric or

21       psychological examination being conducted as required by 18

22       United States Code Section 4243(b).

23              Did you have anything in addition, Mr. Demik?

24              MR. DEMIK:  I don't, Your Honor.  I don't want to

25       be a pessimist, but I can see us back here in 40 days with

JUDITH M. THOMPSON
(605) 348-8610      FAX  (605) 343-6842

1    no report from BOP, so I am going to represent on the

2    record that by the close of business today I am going to

3    facilitate the transmittal of Dr. Manlove's report to Dr.

4    Zilberman.  He will have it in San Diego, California, by

5    Monday of next week.  I am also going to send him a letter

6    explaining what the time frame is and ask him to his very

7    best ability to get that report prepared and to the Court

8    in time that we can address this in 40 days.  That's about

9    all I can do.  I hope for the best.

10         THE COURT:  Yes.  We have experienced repeated

11    delays in Bureau of Prisons mental health facilities

12    getting reports here timely.  We are far enough along in

13    this case and enough is known at the San Diego facility

14    about Mr. Runner that it seems we should be able to get a

15    report back promptly.

16         Mr. Kelderman.

17         MR. KELDERMAN:  Your Honor, I was about to

18    express the same things that the Court and Mr. Demik just

19    did.  I know that there have been a lot of delays lately.

20    I don't believe that Dr. Zilberman, however, has taken

21    longer than expected in this case.  But I was also going to

22    inform the Court I will be contacting Dr. Zilberman as well

23    and let him know about the deadline and ask that he move

24    things as expeditiously as possible.  And I will tell the

25    Court that I am going to keep after this matter as well to

1    make sure it's resolved as timely as possible.

2           THE COURT:  Well, I do order that the United

3    States Marshal Service shall transport Mr. Runner to the

4    facility designated by the United States Bureau of Prisons

5    for the conduct of the psychiatric or psychological

6    evaluation under 18 United States Code Section 4243(b); to

7    do so promptly and to do so in sufficient time and return

8    him to the jurisdiction of this Court so that a hearing can

9    be held within 40 days under the statute up to 45 days

10   under 4247(b).  So that order is in place.

11          I know that that can create difficulties for

12   transport, but I am not interested in granting extensions

13   on transport or an extension on the examination report in

14   this case, given its history.

15          Is there anything further at this time,

16   Mr. Kelderman?

17          MR. KELDERMAN:  No, Your Honor.

18          THE COURT:  Mr. Demik?

19          MR. DEMIK:  No, Your Honor.  Thank you.

20          THE COURT:  Well, the verdict is entered.  I will

21   sign the judgment documents so that this case can move

22   forward under the statutory procedure.  I appreciate the

23   preparation of counsel.

24          Court is adjourned.

25          (End of transcript.)

                        JUDITH M. THOMPSON
                (605) 348-8610    FAX  (605) 343-6842

1                          I N D E X

2                         WITNESSES

3    FOR THE  GOVERNMENT:                        PAGE
     DALE HATZENBUHLER
4         Direct Examination by Mr. Kelderman     3
          Cross-Examination by Mr. Demik          9
5         Redirect Examination by Mr. Kelderman   11

6    HEATHER ALCANTER
          Direct Examination by Mr. Kelderman     12
7         Cross-Examination by Mr. Demik          26

8    MICHAEL ALCANTER
          Direct Examination by Mr. Kelderman     28
9         Cross-Examination by Mr. Demik          36

10   DEFENSE WITNESSES:
     KENNEDY RUNNER
11        Direct Examination by Mr. Demik         39

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE
    STATE OF SOUTH DAKOTA   )
 2                           SS
    COUNTY OF PENNINGTON     )
 3

 4        I, Judith M. Thompson, R.P.R., Official Court Reporter in

 5   and for the United States District Court, District of South

 6   Dakota,

 7        DO HEREBY CERTIFY that I acted as such Court Reporter at

 8   the Hearing of the within-entitled action, and that the

 9   foregoing transcript, pages 1 to 60, inclusive, is a true and

10   complete transcript of my shorthand notes taken at said

11   Hearing.

12        Dated at Rapid City, South Dakota, this 6th day of

13   December, 2014.

14

15

16                              /s/

17                         _____
                           Judith M. Thompson, R.P.R.
18                         Official Court Reporter

19

20

21

22

23

24

25

                            JUDITH M. THOMPSON
                (605) 348-8610      FAX  (605) 343-6842
```

```
 1                    COURT REPORTER'S CERTIFICATE

 2    STATE OF SOUTH DAKOTA      )
                                 )SS
 3    COUNTY OF PENNINGTON       )

 4           I certify that the foregoing is a true and correct
      copy of the transcript originally filed with the clerk of court
 5    on January 2, 2015, and incorporating redactions of
      personal identifiers requested by the following attorneys
 6    of record:  Eric Kelderman and Stephen Demik in accordance with
      Judicial Conference policy.  Redacted characters appear as an
 7    "X" (or black box) in the transcript.
             Dated this 11th day of May, 2015.
 8
                     /s/
 9    _____
      Judith M. Thompson, R.P.R.
10    3177
      909 St. Joseph Street, Suite 505
11    Rapid City, SD 57701
      605-348-8610
12    judy_thompson@sdd.uscourts.gov

13

14

15

16

17

18

19

20

21

22

23

24

25
                        JUDITH M. THOMPSON
              (605) 348-8610     FAX  (605) 343-6842
```